Filed 11/16/23  In re K.S. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re K.S. et al., Persons Coming Under the Juvenile Court Law. | C096472 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.S. et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. 18DP00120, 18DP00121, 18DP00122, 18DP00123) |

After years of efforts to assist the appellant parents G.S. (father) and E.S. (mother) with their four young minors, the juvenile court terminated their parental rights, freeing the minors for adoption, pursuant to Welfare and Institutions Code section 366.26.[1]  The

---

[1]    Undesignated statutory references are to the Welfare & Institutions Code.

parents now challenge that and previous rulings arguing, inter alia, that they were denied reasonable services prior to removal of the minors, denied due process during the dependency hearings, and insufficient evidence supported various rulings made by the juvenile court.[2] We disagree and shall affirm.

## FACTUAL AND LEGAL BACKGROUND

### A. Original Petitions

The parents have four boys. In April 2018, when the Butte County Department of Employment and Social Services, Children's Services Division (CSD) became involved in the family's life, the twins G.S. and J.S. were three years old, L.S. was two years old, and K.S. was nine months old. On April 24, 2018, California's Department of Fish and Wildlife served a search warrant on the family's mobile home regarding the possession and sale of illegal exotic reptiles. Upon entry into the home, the minors were all found locked inside the only room designed for living space, which was secured with a bungee cord thereby trapping the children inside. The four boys had feces on their faces and cuts and bruises on their heads and faces; all were undressed aside from dirty diapers and all had limited speech. Additional safety risks were observed throughout the motor home. The minors were detained and placed into foster care. Two days later CSD filed petitions on behalf of each of the four minors, alleging that the minors came within the provision of section 300, subdivision (b)(1), failure to protect and failure to provide adequate food, clothing, or shelter. CSD also alleged that father has a history of untreated mental health issues that rendered him unable to provide for the regular care of the minors and that he refused to utilize mental health services. On April 30, 2018, the court ordered the minors detained.

---

[2] Mother and father each filed separate briefs but joined and adopted issues raised in the other's brief. (See Cal. Rules of Court, rule 8.200(a)(1), (a)(5).)

The petitions were amended twice to acknowledge the motor home was only temporary shelter, and to include additional allegations of injuries and risks to the minors. The second amended petitions also included father's statement that he suffered from attention deficit hyperactivity disorder, posttraumatic stress disorder (PTSD), and anxiety, and although he had been treating his conditions with marijuana, he was following through with mental health services and had stopped smoking marijuana.

At the jurisdictional hearing on May 24, 2018, the court sustained the second amended petitions for each of the four boys. At the dispositional hearing on June 21, 2018, dependency was declared, the four boys were ordered removed from the care and custody of the parents, and the court ordered reunification services for both parents.

The minors remained out of the parents' care and custody for over a year. CSD alleged neither the living conditions nor the parents' behavior in taking responsibility had changed and recommended more than once that reunification services be terminated and that a hearing be set under section 366.26.

A contested six-month status review hearing took place on June 20, 2019, and June 24, 2019, some 14 months after the minors were originally detained. On July 25, 2019, the juvenile court issued written orders for three of the four minors, excluding L.S. The court found that reasonable services had been provided to the parents, with the exception of a 60-day period for father. The court also found that return of the minors to the parents would create substantial risk of detriment to the minors' well-being and that continued out-of-home placement for the three minors was necessary. The court ordered that reunification services continue for mother, but continued the hearing for father and for L.S. Subsequently, on August 22, 2019, the juvenile court issued written orders reflecting that minor L.S. did not receive reasonable services to address his individualized needs. The court found that L.S.'s return to the parents would create a substantial risk of detriment to him and that out-of-home placement was necessary. The court continued

3

reunification services for mother and continued the hearing for father to the date previously set for the siblings.

The six-month review hearing for father finally went forward on January 30, 2020. Following the hearing, the court found return of the minors to father would create a risk of detriment, but now determined that similar risk was not found as to mother. Thus, the court ordered the minors placed with mother under a plan of family maintenance services and continued reunification services for father. The court scheduled family maintenance and 18-month review hearings for all minors. On March 27, 2020, mother and father filed their notices of appeal of the orders issued on January 30, 2020.[3]

Mother and father also appealed the court's rulings from the July 25 and August 22 hearings. A different panel of this court dismissed the appeal, concluding the claims were rendered moot by the juvenile court's subsequent order of January 30, 2020, returning the minors to mother's care under a plan of family maintenance and continuing reunification services to father. In that opinion, this court also stated: "By the time of the July 25, 2019 hearing, the minors had been detained for 15 months. [Citation.] During that period of time, the parents were receiving reunification services. In fact, our review of the record reveals the parents received 25 months of reunification services from the date the minors were detained: 16 months as of the filing of their notices of appeal and an additional nine months (some of which included family maintenance services to mother) through the trial readiness conference on May 7, 2020. Taking into account the juvenile court's July 25, 2019 finding that father did not receive reasonable services for a period of 60 days, and the juvenile court's January 30, 2020 finding of reasonable services, the parents received a total of 23 months of reasonable services, far in excess of the 18-month maximum. Indeed, the most recent information of which this court took

---

[3]     The appeals were assigned case No. C091786 and were dismissed pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835. The remittitur was issued December 23, 2020.

4

judicial notice indicates the parents are still receiving reunification services, in which case they have received the maximum amount of services permitted under any circumstance." (*In re K.S. et al.* (July 21, 2020, C090285) [nonpub. opn.].)

### B. Supplemental Petitions – Section 387

In March 2020, before the combined family maintenance and 18-month review hearing could occur, CSD filed supplemental petitions under section 387. The supplemental petitions alleged that mother failed to adequately parent the minors in a consistently appropriate manner, failed to satisfy the family maintenance plan, and instead "rapidly declined in her participation in services." The four boys were ordered re-detained on April 14, 2020. A contested jurisdictional hearing regarding the supplemental petitions commenced on June 9, 2020. Finding the allegations true and that the previous disposition had not been effective in the protection of the minors, the juvenile court sustained the supplemental petitions.

However, at the contested dispositional hearing that concluded on November 24, 2020, the juvenile court found that CSD had not sufficiently met its burden in proving the existence of a substantial risk of detriment in returning the minors to the parents' care at that time. Consequently, the court ordered the four boys returned to both parents. The court authorized counseling and substance abuse testing of both parents but did not specifically order family maintenance services. Rather, the court continued the matters for one week for CSD to decide whether they would provide family maintenance services or apparently the court would terminate dependency.[4]

---

[4] Mother and father appealed the dispositional orders. The appeals were assigned case No. C093427 and were dismissed pursuant to *In re Phoenix H., supra*, 47 Cal.4th 835. The remittitur was issued on November 9, 2021.

5

## C. *Subsequent Petitions — Section 342*

Approximately 10 days after the four boys were returned home, an incident prompted CSD to file subsequent petitions pursuant to section 342. The subsequent petitions alleged that mother and father were involved in a domestic violence incident at their home, resulting in a failure to protect the minors and placing them at risk for physical harm and serious emotional damage. (§ 300, subds. (b) & (c).) The four boys were again ordered detained at the contested detention hearing on December 15, 2020. At the contested jurisdiction hearing on December 23, 2020, the juvenile court sustained the subdivision (b) allegations contained in the petitions but did not sustain the subdivision (c) allegations contained therein.

On February 2, 2021, CSD filed a disposition report. The report reflects that the children were all residing with their paternal grandmother. The report also reflects that WRAP services had recently been put into place to train the parents on how to respond to the children's behaviors. In the report, CSD recommended that the parents not be offered services pursuant to section 361.5, subdivision (a)(1)(A) and (B), as the parents had received the maximum period of time available for reunification. The matter was set for a contested disposition hearing. The contested hearing began on March 9, 2021, and continued over nonconsecutive days, concluding on May 20, 2021. On May 20, 2021, the trial court ordered that all minors be removed from the physical custody of the parents as there was a substantial danger to the physical health, safety, protection or emotional well-being of the minors, or would be if the minors were returned to the home, and there were no reasonable means by which the minors' physical health could be protected without removing the minors from the physical custody of their parents. In addition, the trial court found that reasonable efforts had been made to prevent or to eliminate the need for removal of the minors from the home. Moreover, the court ordered that neither parent would be offered reunification services as they had received the maximum period of

6

reunification services, and had not participated regularly or made sufficient progress in court-ordered treatment.  The court scheduled a section 366.26 hearing.[5]

On September 14, 2021, CSD filed a section 366.26 report, recommending termination of parental rights and selection of adoption as the permanent plan.  Both parents objected and argued that the beneficial parental relationship exception applied to prevent the termination of parental rights.  Acknowledging it was a difficult case, the minors' counsel supported termination of parental rights.

At the 366.26 hearing, the court found the minors to be adoptable and terminated parental rights.  It found that the parents had met the first prong of the beneficial parental relationship exception, and it found that the minors had positive interactions with the parents, but it found that the parents had not met their burden "in that the benefit of continuing the relationship is not outweighed by the benefit that an adoptive home would provide."  The parents timely appealed.

**DISCUSSION**

I

*Jurisdictional Findings on the Section 342 Petitions*

The parents claim there was insufficient evidence to support the juvenile court's jurisdictional findings at the section 342 hearing, arguing there was only one isolated incident of domestic violence that posed no actual or substantial risk of harm to the four boys.  The parents further claim other circumstances present, specifically, father being overwhelmed by caring for the minors, mother's arrest after the domestic violence

---

[5]     On May 24, 2021, both parents filed separate notices of intent to file a writ petition.  The petitions were summarily denied on the merits, citing *Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501, 1513-1514, on February 14, 2022, in case No. C094185.

7

incident, and the presence of a known sex offender at the house at the time of the incident do not justify the court's jurisdictional findings. We disagree.

### A. Additional Background

At the disposition hearing on the supplemental petitions on November 24, 2020, the juvenile court ordered the boys to be returned home. Family maintenance services were to be determined, and a court date of December 10 was scheduled to follow up on the provision of those services. On December 8, CSD filed section 342 subsequent petitions, which included allegations under subdivision (b) and (c) of section 300:

b-1.[6] "c-1. On December 5, 2020, the mother and the father engaged in a domestic dispute in the presence of the child. Said dispute included, but was not limited to, the father brandishing a knife; the mother grabbing the father around the neck; the father biting the mother on the arm; the mother pushing the father down on a fence; and the mother and father wrestling with each other on the ground. [¶] c-2. On December 7, 2020, in response to the occasion as cited [above]; the child and or the child's sibling reported 'mommy grabbed daddy neck;' 'Daddy tried to make mommy dead;' 'Daddy tried to cut mommy tire;' 'Daddy tried to cut mommy with a knife and he bite mommy;' and 'Mommy broke the Christmas tree.' "

"b-2. On December 5, 2020, the mother was arrested on charges related to Battery and Child Endangerment following the domestic dispute as cited in c-1.

"b-3. The father stated that the altercation as cited in c-1 occurred because he was overwhelmed with taking care of the children. Additionally, the father reported that the child and the child's siblings were physically abusing him, that he suffers from post-traumatic stress disorder and that he has not eaten in three days due to stress.

---

[6]     These allegations were listed as related to allegations (c-1) and (c-2), respectively, and incorporated by reference into the (b-1) allegation under subdivision (b).

8

"b-4. On December 5, 2020, the mother and father allowed Justin Loughmiller to be at the family's residence. Mr. Loughmiller is a convicted high risk sex offender and has a California Static Risk Assessment Score of (5 High Violent)."

The jurisdiction report authored in support of the section 342 petitions was filed on December 21, 2020. At the jurisdictional hearing on December 23, a social worker with CSD testified to the allegations presented in the jurisdiction report, which included: a witness reported that father brandished a knife and pointed it towards himself, while at least one child was present, and mother pushed father down on a fence. The minors report of the event included: father tried to cut the tires on one of the cars, mother grabbed father around the neck, father bit mother and "tried to make mommy dead," and mother went to jail. Two days after the incident, father stated there was no violence. Mother admitted she had a bite mark but said it was from one of the boys. The social worker opined the bruise she saw as the bite mark was too big to be caused by a child.

Loughmiller, a convicted sex offender, also witnessed the incident. The police report indicated that Loughmiller stated he was in the residence that night, and police saw him walking away from the home.

Father told the social worker that the minors, particularly K.S., abuse him on a daily basis, he suffers from PTSD, he is overwhelmed by taking care of all the minors, and he hadn't eaten for three days prior to the incident. Father also said he knew that his neighbor, Loughmiller, had been convicted of a sex offense against a minor.

The social worker opined that it was not healthy for minors to see this kind of dispute; it can lead to emotional distress, and K.S. was "crying a lot" since the incident because he did not want to be separated from mother. The social worker was also concerned that while the parents stated they have difficulty managing the minors'

9

behavior, they never reached out to CSD for support; the only support network parents had apparently consisted of Loughmiller.[7]

The trial court sustained the allegations under subdivision (b), but not the allegation under subdivision (c). The court said that pertaining to allegation (b-1), there was a preponderance of the evidence to show the four boys were at substantial risk of failing to be protected by: (1) the parents' altercation in front of the minors; (2) father either pointing a knife at himself or intending to slash tires in front of the minors; and (3) having a known sex offender at the residence. As to allegation (b-2), the court found the allegation that mother was arrested on charges related to battery was substantiated. The court also found allegation (b-3) true, as father had testified that he was overwhelmed with taking care of the minors while mother worked, the minors were physically abusing him, and he suffers from PTSD and had not eaten in three days because of the stress. Finally, with respect to allegation (b-4), the court found the allegation true because the neighbor was a convicted high-risk sex offender and the parents, knowing him to be a sex offender, allowed him to be at the family residence.

The court took jurisdiction over the boys. The court found it "a little premature to return the minors home," but did order unsupervised visitation for three hours on Christmas. The court ordered monitored visitation until WRAP services could be commenced with visitation in the home. The court found that reasonable efforts had been made to prevent removal of the minors.

---

[7] When devising a safety plan, the parents reported there was no one they trusted with their children. However, mother called Loughmiller to pick her up from jail after this incident and father previously testified that he lived with Loughmiller for a time, knew Loughmiller was a sex offender, and did not report this to CSD because he did not think it was CSD's business.

*B. Analysis*

"In dependency proceedings, the basic pleading device to assert a child falls within the juvenile court's jurisdiction is a petition. [Citation.] 'It may be an original petition (§ 332), a subsequent petition for children who are already dependents when there are "new facts or circumstances" that bring them within a category of section 300 "other than those under which the original petition was sustained" (§ 342), or a supplemental petition when there are facts which indicate that a previous disposition is not appropriate. (§ 387.)' " (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364.)

"A subsequent petition is filed when new, independent allegations of dependency can be made after the court has initially declared a minor to be a dependent child." (*In re Barbara P.* (1994) 30 Cal.App.4th 926, 933 (*Barbara P.*); § 342, subd. (a).) As with an original petition, we review the court's findings and order sustaining a section 342 petition for substantial evidence, resolving all conflicts in favor of the agency, as respondent, and indulging all legitimate inferences to uphold the verdict. (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 804-805.) Accordingly, "[i]n a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

In this case, there is substantial evidence to support the allegations in the section 342 petitions. The parents argue there was insufficient evidence that a known sex offender's presence at the residence posed a substantial risk of harm to the minors. We disagree. First, contrary to the parents' argument, there was evidence that Loughmiller was in the residence; he told the police he was inside the house at the same time as the minors. Father admitted he had been friends with Loughmiller for over 10 years and knew that Loughmiller had a criminal history involving sexual offenses involving a

11

minor and thought it was appropriate to reach out to Loughmiller for assistance with the minors.[8] The fact that Loughmiller was *known* by father to have been convicted of a sexual offense against a minor and yet part of the parents' inner circle is sufficient to demonstrate a failure to protect the minors against a substantial risk of harm. Indeed, father protected his relationship with Loughmiller when he consciously chose not to report to CSD that he knew his neighbor was a sex offender. Loughmiller was also part of mother's life; she called him to bail her out of jail after being arrested for the incident. Thus, the parents' alliance with Loughmiller, and his presence, was sufficient to satisfy the allegation.

We also disagree that father being overwhelmed by caring for the minors did not result in a substantial risk of harm to the minors, as alleged in allegation (b-3) of the petitions. Indeed, father admitted this was the impetus for the domestic violence incident. The parents' failure to mitigate father's inability to care for the minors was a failure to protect them from a substantial risk of harm.

As noted, father's inability to cope with caring for the four boys came to a head when he wielded a knife in the presence of at least one of the minors, either turning the knife on himself or the tires of mother's car, prompting mother to intervene and leading to the physical altercation. The parents do not deny the domestic dispute occurred but argue it was an isolated incident, did not involve serious harm to either parent or the minors, and thus could not justify the court's jurisdictional finding.

Admittedly, there is only one documented incident of domestic violence in the home and it is not clear how many of the four boys witnessed it. However, domestic

---

[8] Father admitted this knowledge at the contested detention hearing for the subsequent petitions. In the jurisdiction report filed December 21, 2020, CSD requested the court take judicial notice of this testimony, in which father stated he was aware of Loughmiller's criminal history.

violence in the household where minors are living constitutes neglect in that it is a failure to protect the minors from the substantial risk of encountering the violence and suffering serious physical harm from it. "Such neglect *causes* the risk." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194 [minors do not have to be physically present in the same room as the violence to be considered at risk]; see also *In re M.M.* (2015) 240 Cal.App.4th 703, 720 [substantial evidence supported finding there was a substantial risk the minor will suffer serious physical harm " 'inflicted nonaccidentally' " by the mother and/or the father in a single incident of domestic violence]; *In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1470, fn. 5 [common sense and expert opinion indicate domestic violence is detrimental to minors].) Yet the domestic violence incident was not the only stressor. The nature of the incident coupled with father's inability to cope with caring for the minors without significant help from mother is substantial evidence of a failure to protect the minors from a substantial risk of harm.

Finally, there was substantial evidence that the arrest and removal of mother, arguably the more stabilizing parent, from the home with no other appropriate and responsible caretaker for the children resulted in a substantial risk of harm to the minors. The parents' argument to the contrary ignores the impetus behind the incident in the first place — mother's absence from the home and father's inability to care for the minors alone.

II

*Multiple Judges Involved in the Proceedings*

The parents assert that the dispositional orders on the subsequent petitions (and all subsequent orders) should be reversed because several proceedings were heard by different judges who failed to apprise themselves of the factual developments in the case. Parents claim that the judge presiding over the dispositional hearing on the section 342 petitions "expressly refused to read the extensive testimony from the detention and jurisdiction hearings on that petition," both of which were heard by a different judge, and

13

this refusal constituted an abuse of discretion and a due process violation. We conclude the parents' have forfeited these issues by failing to preserve them in the trial court.

*A. Additional Background*

Four judges heard the proceedings in this matter: Judge Barbara Roberts considered and heard evidence from the initial detention hearing and presided over the six-month review hearing on the original petitions. Judge Tamara Mosbarger presided over the dispositional hearing on the original petitions. Judge Kimberly Merrifield presided over the detention and jurisdictional hearings on the supplemental petitions filed in March 2020. Judge Michele Verderosa presided over the dispositional hearing on the supplemental petitions and the detention and jurisdictional hearings on the December 2020 subsequent petitions.

The matter then returned to Judge Merrifield who, without objection, heard and considered evidence at the disposition hearing on the subsequent petitions. During the hearing, Judge Merrifield emphasized that one issue before her was whether the parents had exhausted the statutory timeframe for services, stating "the Court has to look at the entire case, because we're talking about timelines." The court requested briefing from the parties on the options for resolution and allowed the parties to argue the appropriate weight she should assign various past reports.[9] After the close of evidence in the dispositional hearing, there was an off-the-record discussion with counsel regarding the number of judges that had heard the case. Judge Merrifield stated she would order certain transcripts but not the entire hearing for the dispositional hearing held on November 24, 2020, or the testimony from the jurisdictional hearing held on December 23, 2020. Instead, and again without objection, the court ordered transcripts

---

[9]    In continuing the dispositional hearing, the court reiterated that it "is going to want to review notes and look at the file prior to ruling, in any case. That will give me the time to do that."

14

from the following proceedings: the argument, tentative, and final rulings dated November 24, 2020; Judge Verderosa's comments dated December 23, 2020; and the full proceedings dated January 14, 2021.

On the next scheduled court date, Judge Merrifield indicated she had read and considered all of the parties' briefs, as well as the reporter's transcripts of November 24, 2020, December 23, 2020, and January 14, 2021. Nevertheless, the court granted a continuance to allow any final arguments to be presented in writing.

On May 20, 2021, Judge Merrifield entered the following order: "The Court has read and considered the Disposition Report filed 02/02/2021, reviewed the transcripts of previous hearings and read the filed briefs. [¶] . . . [¶] Reunification Services shall not be provided to the mother and father. [¶] A W&I 366.26 Hearing is calendared for 09/16/2021 at 8:30 am." The court found the parents received the maximum period of reunification services, had not participated regularly or made sufficient progress in court-ordered treatment, and return of the minors would create a substantial risk of detriment to the children.

### B. Analysis

At a jurisdictional hearing, the court determines whether the child falls within any of the categories set forth in section 300. (*In re Corey A.* (1991) 227 Cal.App.3d 339, 345-346.) Section 358, subdivision (b) directs: "Before determining the appropriate disposition, the court shall receive in evidence the social study of the child made by the social worker, any study or evaluation made by a child advocate appointed by the court, and other relevant and material evidence as may be offered . . . ." (§ 358, subd. (b).) Section 361 mandates that a dependent child may not be taken from the physical custody of his or her parents, unless the juvenile court finds clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without

15

removing the minor from the minor's parent's, guardian's, or Indian custodian's physical custody." (§ 361, subd. (c)(1).)

Due process in dependency proceedings generally requires that parents be given the right to present evidence, to cross-examine adversarial witnesses, and for counsel to be provided the opportunity to argue the merits of an issue. (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 914-915.) Where proceedings occur in which these procedures are denied, the juvenile court's orders must be reversed. (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1465; *Lesly G., supra*, at pp. 915-916.)

In addition, a court's exercise of legal discretion "must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." (*People v. Russel* (1968) 69 Cal.2d 187, 195, superseded by statute on another ground as noted in *People v. Anderson* (2001) 25 Cal.4th 543, 575.) " 'To exercise the power of judicial discretion all the material facts . . . must be both known and considered.' " (*In re Cortez* (1971) 6 Cal.3d 78, 85-86, citing *People v. Surplice* (1962) 203 Cal.App.2d 784, 791.) "A discretionary order that is based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion, and is subject to reversal even though there may be substantial evidence to support that order." (*Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1124-1125.)

We reject the parents' claim that the fact that several judges presided over different proceedings in this case denied them due process of law or that rulings made by Judge Merrifield constituted an abuse of discretion. Critically, parents failed to object to the change of judicial officers. The record also reflects that contrary to parents' assertion, they failed to request that Judge Merrifield review any specific testimony from prior proceedings and failed to object to the material Judge Merrifield did consider before

16

ruling at the dispositional hearing on the subsequent petitions.[10]  In light of such, the issue is precluded from review.  (See *In re Levi U.* (2000) 78 Cal.App.4th 191, 201 [a failure to raise a due process claim in the juvenile court precludes review of the issue on appeal], superseded by statute on other grounds as stated in *In re B.E.* (2020) 46 Cal.App.5th 932, 940; cf. *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501-502 [the failure to object to the lack of statutorily required evidence waives the issue on appeal]; *In re Mark C.* (1992) 7 Cal.App.4th 433, 444 [upon the exclusion of evidence, the offering party should object and make an offer of proof in order to preserve the issue for appeal].)

Even if the issue were not forfeited there was no violation of due process.  The record shows the court considered the statutorily required evidence.  (§ 358, subd. (b).) The court also provided all parties an opportunity to present evidence, cross-examine witnesses, and argue appropriate options for case resolution.  (See *In re Lesly G., supra*, 162 Cal.App.4th at pp. 914-915.)

III

*Removal of the Minors at the Section 342 Dispositional Hearing*

The parents further argue that the dispositional findings on the subsequent petitions must be reversed because there was insufficient evidence justifying removal of the minors and the juvenile court abused its discretion in failing to order family maintenance services to address the new issues arising from the subsequent petitions. The parents further maintain that they were "set up for failure" when CSD did not provide any services after the minors were allowed to return home following the disposition hearing on the supplemental petitions in November 2020.  We disagree.

---

**10**   In father's letter brief filed on March 17, 2021, counsel noted that multiple judges had heard various proceedings, but this notation does not constitute an objection.  Nor is there an objection on the record.

17

*A. Additional Background*

At the disposition hearing on the subsequent petitions, Guisela Castro, a social worker from CSD, testified that she wrote the disposition report. She recommended that parents not receive any more services because the maximum time for reunification services had expired.

In terms of services offered, Castro testified that in observing a WRAP-supported visitation in February 2021, she thought the parents were overwhelmed by caring for the minors. While the visitation schedule had been three 2-hour visits, it was clear the parents needed a longer period of time to prep for the activities associated with daily living; "It felt a lot like playtime during the two-hour visits, but the parents were still getting overwhelmed." As a result, the visitation schedule changed to one 4-hour visit and one 2-hour visit. Mother had expressed that she was overwhelmed caring for the minors during these visits — even with WRAP support.

Castro testified she offered domestic violence services to father in late December or early January. He declined those services, but at his request Castro provided a pamphlet on healthy relationship cycles and the name of a Website for an agency that offers couples counseling. Both mother and father had been in individual counseling once a week since December 2020. Mother's therapist recommended she continue counseling but because CSD was going to seek termination of services, the social worker did not arrange for additional counseling. Instead, the social worker contacted the therapist to see if mother could continue services under her own insurance.

Castro was not confident the parents would succeed and learn to parent the minors and meet the minors' needs, even with services. She further opined that it was not in the best interest to separate K.S., who presented more parenting challenges, from the other three boys and she did not believe that the parents could safely care for three of the minors.

18

A social worker providing WRAP services testified that as part of the services, the family was provided with Child and Family Team meetings, a parent partner, and family visitation. At the visits, WRAP staff worked with K.S. and the parents to learn coping skills, taking deep breaths, and other options for self-calming and self-soothing skills. The family was receiving five hours of supervised visits per week.

A visit supervisor saw some improvement in the parents' consistency in the use of timeouts and in preparing for activities, but sometimes the parents did not follow through with the activity or would allow a lot of activities simultaneously, which created a relatively chaotic environment. The service team also noted that three-year-old K.S. might need counseling for aggressive behavior, and the WRAP social worker was communicating with the CSD social worker to investigate appropriate options. One visit supervisor testified that he had seen K.S. hitting the parents and K.S. had hit him.

Erik Gledhill, a social worker supervisor for CSD also testified. He was the supervisor on this case for approximately one year. He assisted Castro in formulating the recommendation to cease services. He opined the minors could not be safely returned to the parents' care because the parents struggle to recognize safety threats to the minors or use discipline. Further, they resist suggestions by the WRAP team who are there to coach them and are slow to implement things they have learned. Gledhill opined that the parents' "parenting style is largely unchanged from when the children were originally removed. I see their inability to control their children as the root of all of the safety risks . . . [and] the root of the behavioral problems that we see in some of the children." He did not think the minors necessarily had special needs; rather, he believed the minors respond to discipline and strict boundaries and the minors behave differently in the parents' home versus in the grandmother's home due to the type of parenting used in each household.

Father testified that when the minors were returned to the parents in November, it was the first time the parents had all four minors since they were first detained in 2018. Prior to that, from April to September 2020, the parents did not have any in-person visits

19

with the minors. Between September and November 2020, the parents had approximately 12 in-person, one-hour visits with the minors. By that time, the parents had only two meetings with PCIT (parent child interactive therapy).

Father said when he cared for the boys, K.S. hit, punched, scratched, pinched, and bit. K.S. was "better" if he was able to call mother at work. K.S. exhibited the same behavior when mother was home, but not as often. Father testified that K.S. began exhibiting that behavior immediately after the minors returned home in November and that the parents sent Gledhill a text for help over the holiday.

Father described CSD services as only minimally helpful. However, he admitted that CSD had, in numerous reports, identified areas where father needed improvement and that in the beginning of the case, father was more combative. Father testified that since he had a cyst removed from his brain in March 2020, he has been more understanding and cooperative. Father particularly found WRAP services beneficial as the providers seem more engaged. Father stated he also attends child abuse class every week.

At the close of evidence at the disposition hearing, the court asked the parties to address: (1) the applicability of *In re D.N.* (2020) 56 Cal.App.5th 741 and *In re Brequia Y.* (1997) 57 Cal.App.4th 1060 regarding extraordinary circumstances and (2) the court's options at this juncture. The court stated it expected the family to continue to receive services pending the ruling on the hearing.

The parties each submitted multiple briefs. CSD argued that it met its burden to justify removal of the minors, that the statutory timeline for services had expired, and that no extraordinary circumstance existed to justify the continuation of services past the statutory maximum allotment.

Mother and father argued that K.S. had not received appropriate services for three months, and mother requested reunification services be extended for three months for K.S. In the meantime, mother requested that the other three minors be returned home

20

with family maintenance services. Father also argued that CSD's failure to offer WRAP services sooner resulted in a failure to provide reasonable services. According to father, despite CSD's reluctance to work with the family, the parents had made great strides in caring for their minors and there was insufficient evidence of detriment to the minors if they were to return home.

The parents each argued that extraordinary circumstances existed justifying the continuation of services past the statutory maximum timeframe. Both parents argued that father's brain cyst and subsequent surgery placed undue hardship on the family. Father argued that the Camp Fire in Paradise exacerbated problems associated with his brain surgery because his medical records were destroyed in the fire, resulting in delays with the surgery. Both parents also argued the COVID-19 pandemic constituted an extraordinary circumstance. During this time, the parents were unable to see the minors face-to-face for over five months and when visits did resume in-person, interaction with the minors was hindered by the minors' caregiver, who imposed restrictions out of fear of contracting COVID-19.

In ruling on the disposition, the court found that the case was "way past the 18 months"[11] and the court did not find there were exceptional circumstances beyond the parents' control. The court rejected the parties' argument that father's medical issue, the COVID-19 pandemic, and the fact that WRAP services could have been implemented earlier constituted exceptional circumstances. The court weighed the minors' need for stability and prompt resolution of their custody against whether there would be substantial probability of return within six months and the court stated it could not make

---

[11] The parties do not dispute that the maximum time for reunification services has expired. As noted throughout the opinion, the parents focus on potential exceptions that they argue warrant extending the time for services.

that finding. The court also found that reasonable efforts had been made to prevent or eliminate the need for removal.

The court considered the extent of the parents' compliance with the case plan, finding mother and father had made minimal progress in mitigating the causes necessitating the minors' placement. The court found that return of the minors would create a substantial risk of detriment based on the circumstances reported in the most recent petitions and there were no reasonable means by which the minors' physical health could be protected without removal.

### B. Analysis

At a dispositional hearing, the court generally chooses between allowing the child to remain in the home of a parent with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification. (*In re E.E.* (2020) 49 Cal.App.5th 195, 205.) Before the juvenile court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence that: (1) a substantial danger exists to the well-being of the minor if the minor were returned home, and (2) there are no reasonable means to protect the minor's physical health without removing the minor from the parent's physical custody. (§ 361, subd. (c)(1).) " 'Clear and convincing' evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt." (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208.) The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. (§ 361, subd. (c)(1).) As to the second issue, the juvenile court must also determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

Here, the juvenile court made the requisite findings under section 361, subdivisions (c)(1) and (e). A removal order on these grounds " 'is proper if based on proof of parental inability to provide proper care for the child and proof of a potential

22

detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

When presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence by the court below, the appellate court "must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B., supra*, 9 Cal.5th at p. 1005.)

The parents argue that CSD's failure to account for the parents' myriad issues such as their lack of custody for a significant period of time, health and housing challenges, struggles to maintain contact through COVID-19, as well as the minors' serious behavioral challenges resulted in a failure to meet its duty to provide reasonable efforts to prevent removal of the minors. Nevertheless, they argue, they have made progress. They maintain they have addressed the minors' housing, clothing and educational needs since the original petitions were sustained and were providing appropriate care by investigating therapy options for K.S. and appropriately putting K.S. on timeout when his behavior was inappropriate. Thus, they argue there is insufficient evidence to support the juvenile court's ruling at the dispositional hearing. We disagree.

We find the record reflects that the minors have been placed outside the home for over three years and while the parents received well over the 24-month maximum time for services, the minors' needs have largely been met by other caregivers during that time. In addition, parents' argument ignores the circumstances leading up to the domestic violence incident that resulted in CSD filing subsequent petitions. We have

addressed those circumstances *post*, and we need not repeat them here in great detail. It suffices to say that when the minors returned to the parents in November, the situation deteriorated quicky such that in less than two weeks' time, father was not eating, and the incident involving father's use of a knife either on himself or car tires and a struggle with mother ensued. This chaos erupted while the minors were home, and a sex offender was either in the home or nearby while the parents fought outside. Father admitted his inability to care for the minors or to handle their behavioral issues led to the incident, and that his stress had been mounting for days, yet no significant efforts were made to forestall it. Mindful of the elevated standard when reviewing a finding of clear and convincing evidence, we conclude "the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B., supra*, 9 Cal.5th at p. 1005.)

The juvenile court, however, did not "state the facts" supporting its decision, as required under section 361, subdivision (e). Standing alone, the boilerplate findings in the record are not a sufficient substitute for the juvenile court making necessary factual findings on the record tailored to the case. (See *In re D.P.* (2020) 44 Cal.App.5th 1058, 1067 ["the juvenile court erred when it removed [the child] from mother's custody without stating the facts supporting removal"].) Nonetheless, this error alone does not warrant reversal. The failure to make the required findings under section 361, subdivision (e) is deemed harmless if " 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody.' " (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.) On this record, we find it not reasonably probable the result would have been more favorable to the parents but for this error, as the ultimate legal conclusion was supported by substantial evidence.

The parents blame any shortcomings on CSD, accusing the department of setting the parents up for failure when they had little visitation with the minors between April

24

and November 2020 and the minors were returned without any support services in place. The record reflects that since April 2018, the minors were in the parents' care for less than three months. The parents, who have been receiving services during this time, well over the statutory maximum, cannot prevail on the argument that they were without services for the 11 days between November 24 and the domestic violence incident on December 5.

Nor can the parents prevail on a claim that there exists reasonable means by which the minors could still be protected if they were to remain with the parents, particularly if services such as WRAP were continued. The parents are not entitled to more. Indeed, placing the minors with the parents and relying on additional social services to protect the minors — over three years since the minors were initially removed from the home — is unreasonable. The parents are essentially asking to coparent their minors along with social support services. That is not compatible with the legislative scheme. Rather, "to promote the prompt resolution of the child's custody status and her permanent and stable placement, the law sets a presumptive 18-month limit on reunification services. . . . [T]he time limit reflects a considered legislative choice: '[I]n order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate.' [Citation.]" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 627.)

IV

*Failure to Order Reunification Services*

The parents argue the juvenile court erred in refusing to order reunification services to address new allegations not contained in the original petitions; and/or in failing to find that extraordinary circumstances existed to justify additional services past the 18-month statutory timeframe. We are unpersuaded.

When the juvenile court removes a child from parental custody and adjudges the child a dependent, the court must ordinarily order family reunification services for the

25

parent and child. (§ 361.5, subd. (a).) There are presumptive limits on reunification services. If a child under the age of three is removed, as was the case here, reunification services are presumptively limited to six months, but no longer than 12 months from the date the child entered foster care. (§ 361.5, subd. (a)(1)(B).) For minors over the age of three, the period for reunification services is limited to 12 months from the date the child entered foster care. (§ 361.5, subd. (a)(1)(A).) "In order to extend services beyond that 12-month date and up to 18 months from the date of initial removal, the juvenile court was required to make the specific factual findings set forth in sections 361.5, subdivision (a)(3) and 366.21, subdivision (g)(1)." (*San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 222; *id.* at p. 224 [juvenile court could not "make the necessary findings to extend services beyond 18 months, regardless of whether or not reasonable services were provided" because, under the facts of the case, "the statutorily required factors were not present"]; *Michael G. v. Superior Court, supra*, 14 Cal.5th at p. 627 [the law sets a presumptive 18-month limit on reunification services].)

"A juvenile court has broad discretion when determining whether further reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion. [Citation.]" (*In re William B.* (2008) 163 Cal.App.4th 1220, 1229, superseded by statute on other grounds.)

As noted, a different panel of this court previously determined that the parents were not entitled to reunification services after April 30, 2019, without specific factual findings made by the juvenile court. (*In re K.S. et al., supra*, C090285; see §§ 361.5, subd. (a)(1)(A) & (a)(3), 366.21, subd. (g)(1).) That calculation was based on the ages of the eldest two minors, who were three years old when all the minors were detained on April 30, 2018. No specific factual findings were made by the juvenile court and yet services continued. The 24-month maximum for services ran on April 30, 2020, yet

26

services continued. (*In re K.S. et al, supra*, C090285, citing *San Joaquin Human Services Agency v. Superior Court, supra*, 227 Cal.App.4th at pp. 222-223.)

The parents do not dispute this calculation. Rather, citing to *Barbara P., supra*, 30 Cal App.4th 926, they argue that because the subsequent petitions were based on new allegations, for which services had never been provided, they were entitled to additional services beyond the 18-month stage. Specifically, parents claim "no services were ever provided to address the current conditions — domestic violence, sexual registrants, father's stress caring full-time for four special needs children after years of minimal visitation, or [K.S.]'s violent behaviors."[12]

In *Barbara P*., the court held: "When the court later considers a subsequent petition alleging additional bases of dependency jurisdiction, further reunification services are not required in all cases. Failure to order additional reunification services after finding jurisdiction on a subsequent petition constitutes reversible error only if the particular facts of the case demonstrate an abuse of discretion in failing to order additional services. Key factors in this determination would be whether the services already offered were adequate, whether they addressed the concerns raised by the subsequent petition, and whether the objectives of the reunification plan — the reunification of the family—could be achieved with the provision of additional services." (*Barbara P., supra*, 30 Cal.App.4th at p. 934.)

As in *Barbara P*., this is not a case that would benefit from additional services. In *Barbara P*., the mother received more than 18 months of services under the original

---

[12] We reject the parents' argument, raised for the first time in the reply brief, that the juvenile court did not understand it had the discretion to order additional services after the presumptive time limit had expired. Ordinarily, points raised for the first time in a reply brief will not be considered. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.) In addition, the record reflects the juvenile court was aware that continuing services under section 352 was an option.

27

petitions. The appellate court noted that many of the services offered under the plan adopted pursuant to the original petitions were directly relevant to the allegations of serious emotional damage raised in the subsequent petitions; the juvenile court found that the mother made no significant progress in her own therapy and that the department had provided reasonable reunification services. The juvenile court rejected the mother's claims that the department had made reunification difficult, finding instead that she had impeded progress in this regard. The appellate court concluded that in "such a case as this, additional reunification services would have added to the time that the minors were deprived of a stable and secure home, would not have been more specifically tailored to the allegations of the subsequent petition than those already required under the original petition, and — given [the mother]'s demonstrated behavior — would not have made reunification of this family more likely." (*Barbara P., supra*, 30 Cal.App.4th at p. 934.)

Here, circumstances are similar to those in *Barbara P*. In this case, the parents have had well over 18-months of services. Many of the services offered were relevant to the allegations of substantial risk of harm due to the parents' ability to supervise and protect the minors raised in the subsequent petitions; the juvenile court found that the parents had not participated regularly or made sufficient progress in court-ordered treatment and that the department had provided reasonable reunification services.

Indeed, the parents' ability to provide a safe, stable home for the minors has been a concern in each petition filed in this case and the court has nearly consistently found services offered have been reasonable. The parents' attempt to characterize the December 5 incident as presenting completely new issues to be addressed is unpersuasive. To be sure, although the incident in December involved domestic violence, the impetus for the event was father's inability to parent the four minors while mother was away at work, and their joint failure to mitigate the situation. Father's stress over the situation resulted in the introduction of several safety concerns to the boys including father's inappropriate use of a knife, a physical altercation with mother, and the

28

close proximity of a sex offender. At the heart of the incident was the parents' actions that created a substantial risk of harm to the minors. Similar safety concerns were expressed in the previous petitions. Thus, while the manifestations of the parents' inability to recognize safety concerns and adequately keep their minors safe may have changed from petition to petition, the main concern has not: the parents continue to struggle to adequately care for their children. As noted, services to address this concern have been provided for well over 18 months.

Moreover, the parents' focus on the failure to provide domestic violence services or services to address sexual registrants is misguided. CSD offered father domestic violence counseling after the incident in December. He declined those services, but at his request Castro provided a pamphlet on healthy relationship cycles and the name of a Website for an agency that offers couples counseling. Both mother and father had been in weekly individual counseling since December 2020. Additionally, though we are not clear as to what services parents seek relating to their inclusion of a sex offender in their lives, we note that concerns with that decision would be addressed through parenting-related services.

Finally, in the present case, the juvenile court found there was not a substantial probability that the boys would be returned to the parents' custody, even if additional services were provided. As explained above, despite the parents receiving over two years of reunification services, they were unable to overcome the key problems that led to the minors' initial removal from their care. The juvenile court reasonably concluded that additional services would not have made reunification more likely. Instead, "[i]n such a case as this, additional reunification services would have added to the time that the minors were deprived of a stable and secure home." (*Barbara P., supra*, 30 Cal.App.4th at p. 934.)

The parents also assert that the juvenile court abused its discretion in failing to acknowledge the extraordinary circumstances faced by the parents, justifying additional

services past the statutory time limit, while the juvenile court continued the matter under section 352.

Section 352 allows a court to order a continuance only if it is not "contrary to the interest of the minor," giving "substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a)(1).) A court has the "discretion under section 352 to continue a section 366.26 permanency planning hearing — and in the meantime, to extend reunification services past the 18-month mark — in extraordinary cases. Before granting the extension, however, the court must determine that the extension, and the resulting delay to the child's permanent placement, is not contrary to the child's interests." (*Michael G. v. Superior Court, supra*, 14 Cal.5th at p. 634.) "Extraordinary circumstances exist when 'inadequate services' are offered by the child welfare agency or 'an external force over which [the parent has] no control' prevented the parent from completing a case plan." (*In re D.N., supra*, 56 Cal.App.5th at p. 762.) "A court's use of its discretionary authority under section 352 may be particularly appropriate in cases where a parent has never received reasonable services during the reunification stage. . . In such cases, California courts have recognized the availability of relief under section 352 to extend the review period and order an additional six months of reunification services." (*Michael G., supra*, at p. 633, fn. 9.)

Here, the juvenile court rejected the parents' argument that extraordinary circumstances existed outside their control. The court stated that it could not find a substantial probability of the minors' return within six months, and extending services was not justified. The court considered this against the minors' need for stability and resolution and concluded that given both the parents' lack of sufficient progress in court-ordered treatment during the pendency of the case, additional services would not be in the minors' best interest. The record supports this conclusion.

While the parents had hardships that may have made compliance difficult, there is no evidence that these hardships made it impossible to complete the plan or to progress with services. Father admitted to being resistant to services until he had brain surgery in March 2020. At that point, he claimed, he became more engaged and receptive. During that same time, mother was provided housing with the minors but was not compliant with services or house rules, leading to her eviction and CSD's supplemental petitions. Neither parent made sufficient progress to be able to maintain a stable, safe home for the minors, as is evident by the December 5 incident. On this record, the court reasonably concluded the minors' interests were best served by moving forward with the case; we see no abuse of discretion. (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1505 ["It defies common sense to continue reunification efforts for a parent who has made minimal efforts throughout a case"].)

V

*Termination of Parental Rights*

The parents also argue the juvenile court erred by failing to find the beneficial parental relationship exception to adoption applied prior to terminating their parental rights. We find no error.

*A. Additional Background*

At the hearing pursuant to section 366.26, the court admitted the following into evidence: an adoption report and addendum prepared for the hearing; visitation reports; and a bonding study.

Ce Eshelman, a marriage and family therapist and attachment and trauma specialist, authored the bonding study and testified as an expert in bonding and attachment. She described attachment as an innate process that creates a reciprocal relationship between parent and child within the first 33 months of life from conception. She testified to four attachment styles. For example, in a secure attachment, there is a reciprocal give-and-take relationship. In an ambivalent attachment, the relationship is

31

insecure and the child behaves by coming in close to the parent and then pushing the parent away. Avoidant attachment is where a child feels alone, that the parent is unavailable, and removes himself or herself from caregivers. Finally, disorganized attachment is the most disturbed form of attachment and happens when the child can't figure out how to get his or her needs met in a patterned way. The result is disorganized behavior that is hard to understand and a child who is difficult to soothe because the child is afraid of the caregivers. Eshelman testified that it was not possible to have "no attachment" with a parent, just levels of secure or insecure attachments.

Eshelman spent 10 and a half hours with the family in conducting the bonding study. She testified that the "children have Attachment Challenge" and the behaviors observed were concerning; the minors "all need treatment." Eshelman explained the attachment style she believed fit each child. With respect to father, J.S. enjoyed interacting with father, which showed he felt safe with father, but also needed and craved connection with father, which showed the attachment was insecure. She opined that J.S. had an ambivalent attachment to father, but a secure attachment to mother. She opined that if mother were out of the life of J.S., he would be emotionally harmed as if mother died. G.S. also had an ambivalent (insecure) attachment to father and a secure attachment to mother. Eshelman opined that G.S. appeared to be emotionally fragile and in need of specialized intervention. He would feel the loss of his parents as deeply as if he experienced their deaths and it would be difficult to recover from that loss. L.S. had an avoidant (insecure) attachment with his parents. Although L.S. thinks he's parenting himself, Eshelman opined that he would also experience the loss of his parents as if his parents died. K.S. has the most severe attachment challenge — disorganized. Eshelman opined that K.S. acted more like a toddler than what was appropriate for his four years of age. K.S. was insecurely attached to both his parents. Because of K.S.'s significant impairment, he was going to have to do a lot of repair work over his lifetime.

Eshelman also opined that father had a strong bond with all four boys and, despite impact from extreme poverty, childhood trauma, and mental and medical health issues, he has managed to be a "consistent, loving, attachment figure in the children's lives." Yet, if father is in charge of all four boys, he gets overwhelmed and is unable to engender calm; he relies heavily on mother.

All four of the minors demonstrated the desire to maintain a relationship with mother, father, and the grandmother. Eshelman recommended that the minors continue to be placed with the grandmother, with the goal of guardianship, with increased visitation with the parents. She testified the parents are significant figures in the minors' lives and the minors need time to experience the attachment they have with their parents. She also testified that if parental rights were terminated, the four boys would experience another adverse childhood experience, and the more adverse experiences the boys have during childhood, the higher the risk of drug and alcohol abuse, early pregnancy, and other health risks occurring earlier in life. Eshelman testified that the prevailing thought in attachment theory is that continued contact is more beneficial than termination of parental rights, despite the Legislature's intent to prioritize termination of parental rights unless an exception applies. She believed that if parental rights were terminated, it was unlikely, even with therapy, that the minors would become securely attached to someone other than their biological parents. However, she believed the minors could, with therapy, become securely attached to their biological parents — it would just take hard work for the remainder of their childhood. In conducting her assessment, Eshelman did not weigh the wound associated with terminating parental rights against what the minors would receive in the current placement.

Eshelman repeatedly asserted that a child's attachment to a parent is a different feature than the relationship the child has with the parent. Where relationships build over time, attachment is hardwired into the brain. When confronted by the fact that in the past L.S. engaged in self-harming behavior, such as head-banging, but that those behaviors

had stopped as visits with the parents were reduced, Eshelman testified that she was not prepared to conclude, without further information, that L.S.'s reduced head-banging was due to the decrease in visits.

Bertha Ramos-Romero, an adoption specialist with the county, testified she has periodically been assigned to the case since June 2019. She authored the adoption report, as well as an addendum. She testified that the grandmother was very committed to adopting all four of the minors.

As part of her assessment, Ramos-Romero considered the fact that the parents have maintained as regular a visitation schedule as the law would allow. She stated that generally the visits were good, the minors appeared happy to see the parents, and the visits ended without issues, but "their relationship resembles that of extended family members" and the benefit of the visits was that it was playtime for the minors. Recently, the visits have been once a month for an hour; the minors were fine with that but don't seek additional visits from the parents. She believed that once the visits were reduced, there was more stability and emotional regulation in the home.

She opined that the minors' relationship with the parents was not substantial, and the benefits of adoption would outweigh the harm from the termination of parental rights. Ramos-Romero thought the minors would obtain a better sense of stability upon adoption, and that stability should lead to additional developmental progress.

Father testified that he thought each child would have a hard time if they never saw the parents again. Father opined that L.S. would self-harm, K.S. would never be able to handle authority, G.S. would have screaming fits, and J.S. would lash out at his brothers.

Mother's testimony echoed that of father's. She opined that if parental rights were terminated, J.S. would become a "very unhappy, withdrawn child of the system." She also thought L.S. would engage in severe self-harm. Mother testified that she wanted to be a part of the minors' life.

After closing arguments, the court agreed that it was clear the parents love the minors. Nevertheless, the court found by clear and convincing evidence that the minors were adoptable. The court further found that the parent/child beneficial relationship exception did not apply. Specifically, the court found the parents met their burden of establishing the first prong: there had been regular visits and contact with the parents. As for the second and third prongs — whether the minors would benefit from continuing the relationship and whether termination of parental rights would be detrimental to the minors — the court noted that the exception focused on the relationship between parent and child, and that attachment was one factor of that relationship. Other factors included the age of the minors, the portion of life they had spent within the parents' custody, positive or negative interactions between the minors and the parents, and the minors' particular needs. The court found these very young minors had spent either one half or the majority of their lives out of their parents' care. Although the court believed the minors had positive interactions with their parents, the court concluded the parents had not met their burden to show that the benefit of continuing the relationship was not outweighed by the benefits that an adoptive home would provide. The court ordered the parental rights terminated and adoption as the permanent plan for the minors.

*B. Analysis*

At a section 366.26 hearing, the juvenile court "shall terminate parental rights and order the child placed for adoption" if it finds "by a clear and convincing standard, that it is likely the child will be adopted." (§ 366.26, subd. (c)(1).) Juvenile courts should decline terminating parental rights only in " 'exceptional circumstances' " where the parent "can establish termination would be detrimental to the child under one of the statutory exceptions." (*In re D.P.* (2022) 76 Cal.App.5th 153, 163.) One such exception is the beneficial parental relationship exception, which applies when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[T]he parent must show that

35

terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 636.) There are three elements to establish this exception: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Id.* at p. 631, italics omitted.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C., supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Here, the first element is not at issue. In support of the parents' position that these minors have a substantial, positive emotional attachment to them, the parents note that there was evidence of positive interactions during visitation. The parents and the minors hugged and kissed and the parents used positive language with the minors. The parents were described as engaged, playful, and patient. Indeed, the juvenile court acknowledged the parents loved their minors. However, it is not enough for a parent to show frequent and loving contact during pleasant visits. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Nor is the fact that the minors enjoyed visits and were happy to see the parents sufficient to establish that the minors have a substantial, positive emotional attachment to them.

For the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than that of a friendly visitor or friendly nonparent

relative, such as a grandparent or aunt. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) "[A]n emotional attachment is one where the child views the parent as more than a mere friend or playmate." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) Here, the parents have not shown that the attachment rose to that level. While the parents provided limited care and entertainment during visits, there was minimal evidence that separating from the parents at the end of visits caused any emotional trauma. Visitations were described as "a lot like play time during the two-hour visits, but the parents were still getting overwhelmed." The county adoption specialist also opined that the minors were happy to see the parents. She opined "their relationship resembles that of extended family members," and the benefit of the visits was that it was playtime for the minors. The minors do not ask for their parents and do not cry when the visits end.

Neither the fact that the minors love the parents nor that they said they want to live with the parents someday are sufficient evidence of their substantial, positive emotional attachment to the parents. Rather, "[a] 'significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.' [Citation.] A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability." (*In re B.D., supra*, 66 Cal.App.5th at p. 1230, citing *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) Here, there is no evidence the minors' relationship with the parents provide them with a sense of security and stability. We note that when visits with the parents were reduced, the minors' behavior improved. According to the bonding specialist, the minors have only an insecure attachment to father and only two of the minors have a secure attachment to mother. And, as the juvenile court noted, attachment is only one factor to consider in determining the strength of the relationship. Other parts of the equation in this case are similarly lacking: the minors were very young and had already spent a considerably period of their lives outside the custody of the parents. During this time,

37

their needs have been met by other caregivers. (See *In re Autumn H., supra*, at p. 576 [the age of the child and time spent in the parents' custody are factors that affect the parent/child bond].)

However, even assuming the parents established their relationship with the minors was sufficiently significant and positive and that continued contact would benefit the minors, they failed to meet their burden to establish that the detriment of termination outweighed the benefits of adoption. In determining whether the exception applies, the juvenile court performs a balancing task of determining whether "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) Here, there was conflicting evidence of a detriment in terminating parental rights. Both parents testified at the hearing. They each opined that the minors would have a difficult time adjusting if they could not see the parents again and opined that each child would react negatively in his own way. The bonding specialist opined that even with insecure attachments to the parents, the minors would be impacted the same level as if they were securely attached to the parents. However, the bonding specialist also testified to negative components of the relationship between the parents and the minors. In particular, she acknowledged that if father cares for all four boys, he gets overwhelmed and is unable to engender calm on his own. The adoption specialist testified that the relationship between the parents and the minors was not substantial, and it resembled that of extended family member. She explained that while the minors are happy to see their parents for visits, they only visit

38

them once a month and don't ask for them in between those visits. Additionally, the minors don't have difficulty separating from the parents at the end of visits. She noted that the minors are okay seeing the parents infrequently and don't need them every day to get their everyday needs met.

Since 2018, and from a very young age, the minors have only been in their parents' custody for three months, and even then, it was not consecutively. The minors have also experienced multiple removals from their parents' care. The minors deserve the opportunity to be raised in a permanent, stable home environment under the care and custody of a stable nurturing parent whom they can count on to continue to provide them with the support they need. For a significant portion of the duration of this case, this role has been filled by paternal grandmother who is very committed to adopting all four of the minors. There was little to no evidence of great harm or detriment to the minors in terminating parental rights outweighing the benefits of adoption. (*In re Caden C., supra*, 11 Cal.5th at pp. 631-632 [only if severing the parent-child relationship would deprive the child of a substantial, positive emotional attachment such that termination would be harmful to the child, even considering the benefits of a new adoptive home, should the court not terminate parental rights].) We conclude the juvenile court did not err in declining to apply the beneficial parental relationship exception to adoption.

## DISPOSITION

The juvenile court's orders are affirmed.

_/s/_
EARL, P. J.

We concur:

_/s/_
RENNER, J.

_/s/_
MESIWALA, J.